IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PAULA A. ZAJAC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 06-1288 |
| | ) | |
| v. | ) | Judge David Stewart Cercone |
| | ) | Magistrate Judge Lisa Pupo Lenihan |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | Doc. Nos. 7, 9 |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

### I.    RECOMMENDATION

It is respectfully recommended that Plaintiff's Motion for Summary Judgment (Doc. No. 7) be granted, and Defendant's Motion for Summary Judgment (Doc. No. 9) be denied, and that the decision of the Commissioner of Social Security denying an award of disability insurance benefits be vacated and remanded for further proceedings consistent with this report and recommendation.

### II.    REPORT

Presently before the Court for disposition are cross motions for summary judgment.

#### A.    Procedural History

Paula A. Zajac ("Plaintiff") filed an application for disability insurance benefits ("DIB") on November 21, 2003, claiming that she became disabled on October 19, 2003 and that she was limited in her ability to work due to "back fusion, knee and shoulder surgery, celiac disease, fatigue, tiredness, and pain allover."[1]  (R. 47 - 49, 59.)  The state agency denied her application on March

---

1.  Plaintiff attached a supplemental sheet to her application for disability, in which she listed twenty-seven illnesses, injuries and/or conditions that limited her ability to work.  (R. 68.) Notably, Plaintiff included in this list:  C3-7 corpectomy; right shoulder acromioplasty with distal clavicle resection; osteoarthritis; fibromyalgia; chronic pain; Lyme Disease; upper neck

15, 2004.  (R. 31.)  On April 9, 2004, Plaintiff requested a hearing before an Administrative Law

Judge. (R. 36.) A hearing was held on March 18, 2005 before Administrative Law Judge William

E. Kenworthy ("ALJ"). (R. 569 - 94.)

On April 27, 2006, the ALJ determined that Plaintiff was not disabled within the meaning

of the Social Security Act. (R. 22.)  Specifically, the ALJ found that the medical evidence indicated

that Plaintiff suffers from supraventricular tachycardia; celiac sprue; fibromyositis; cervical disc

disease, status post fusion; asthma; and gastroparesis; impairments that are severe within the

meaning of the regulations.  (R. 17.)  Because he concluded that none of these impairments was

severe enough to meet or medically equal, either alone or together, one of the impairments listed in

the Listing of Impairments, Appendix 1 to Subpart P of Part 404,[2] the ALJ proceeded to determine

Plaintiff's Residual Functional Capacity ("RFC") for performing the requirements of her past

relevant work or other work existing in significant numbers in the national economy.  Weighing the

evidence as a whole, the ALJ determined that although Plaintiff could not perform her past relevant

work, she retained the RFC  to perform sedentary work, lifting no more than ten pounds

occasionally, sitting up to four hours per day and standing or walking about four hours a day, with

an option to change positions at intervals of about one-half hour, and avoiding climbing, repetitive

reaching or pulling or repetitive fine motor movement, and that given these restrictions, jobs existed

in the national economy which she could perform.  (R. 19.)

---

spasm; headaches; anxiety disorder; depression; fatigue; numbness in arms and fingers; upper
and lower back pain; restless leg syndrome; celiac sprue; digestive problems; malabsorption;
diarrhea; general weakness; allergies (food and environmental); asthma; and non-erosive
gastritis.  (R. 68.)

2. 20 C.F.R., Pt. 404, Subpt. P, App. 1 (2005).

Plaintiff filed an appeal with the Appeals Council to review the ALJ's decision. (R. 10.) The Appeals Council denied Plaintiff's request for review, holding that they found no reason to review the ALJ's decision, making the ALJ's decision the final decision of the Commissioner of Social Security ("Commissioner"). (R. 6 - 8.)

On December 19, 2006, Plaintiff, by her counsel, filed a complaint pursuant to 42 U.S.C. §§405(g) and 1383(c)(3),  requesting review of the final decision of the Commissioner denying her claim for disability insurance benefits under Title II of the Social Security Act. (Compl. ¶ 1.) Plaintiff claims the ALJ erred in determining she was not disabled in three respects: (1) the ALJ erred in determining that Plaintiff's testimony was not entirely credible and failed to comply with the requirements of Social Security Ruling 96-7p in evaluating the credibility of Plaintiff's subjective complaints; (2) the ALJ erred by not giving greater weight to the evidence provided by Dr. D'Auria and Dr. Trachtman and by not providing an adequate explanation for failing to analyze that medical evidence; and (3) the ALJ erred in relying upon the vocational expert's testimony in response to a hypothetical question which did not include all of Plaintiff's limitations.

## B. <u>Statement of Facts</u>

Plaintiff's alleged disability began on October 19, 2003. (R.59.) At the time of the hearing, Plaintiff was forty-six years old (R. 14), which makes her a "younger person" under the regulations. 20 C.F.R. § 404.1563(c).  Plaintiff's highest level of education is completion of high school. (R. 65, 113, 572.)  She was employed as a personal care attendant thirty-five to forty hours per week from May 2001 until the onset of her alleged disability. (R. 60, 69, 75.)  As a personal care attendant, Plaintiff took care of wheelchair-bound individuals who suffered from ataxia.  (R. 572.)   From August of 2000 until August of 2003, Plaintiff also worked in the school district as a teacher's aide

with very violent autistic children thirty-five hours per week (over a ten month period).  (R. 51-52; 69, 75, 572.)[3]  In 2002, Plaintiff was off work due to work-related injuries which she sustained while working as a teacher's aide and for which she required shoulder and neck surgery.  Although she was not released to return to light duty work from the neck surgery until May 6, 2003, Plaintiff actually resumed her job as a personal care assistant on March 20, 2003.  She was unable to return to her job as a teacher's aide, however, because that required restraining profoundly autistic children with violent tendencies and her supervisor would not let her return to that position because of her limitations from her prior knee, shoulder and neck surgeries.[4]  (R. 573-74.)  Plaintiff's supervisor at the school district offered her a lighter duty position in a prison working with boys 18 years and younger,[5] but she declined that offer because her husband did not want her working in that environment. (R. 574.)  Plaintiff continued to work as a personal care attendant until October 19, 2003, when she stopped working because she could no longer perform the exertional demands of that job due to increased pain. (R.  387.)

The record contains two written statements from Plaintiff regarding her activities of daily

---

[3].  Plaintiff's work history record, DIB Review Sheet, and Certified Earnings Record indicate that she was employed from 1976 through 1988, and from 1991 to the alleged onset date in October of 2003.  (R. 51-55, 75-82.)  During this time period, Plaintiff often worked more than one job at the same time.  (Id.)

[4].  In her Disability Report, Plaintiff stated the reason she stopped working was she was "layed off."  Apparently, she was referring to her job as a teacher's aide, because she attempted to return to that position in the spring of 2003 for one month, but could not perform the job without the assistance of another worker.  So she was told by her employer that  she could no longer work as a teacher's aide.  (R. 59, 573-74.)

[5].  There is no evidence in the record which describes either the duties or exertional level required of the lighter duty position at the prison offered to Plaintiff.

living ("ADLs") and the limitations on ADLs as a result of her medical conditions.  The first one is dated December 29, 2003, and was submitted with her Disability Report ("first ADL statement"). (R. 83-93.)  In the first ADL statement, Plaintiff indicated that she needed assistance with preparing dinner and doing the laundry (cannot lift or carry laundry baskets).  (R. 83, 85.)  If she does more than usual on a particular day, the next day she is in a lot of pain and usually ends up resting in bed or on the couch all day.  (R.83.)  Plaintiff also indicated she needed assistance ascending and descending stairs, can only climb 3 to 4 steps before needing a rest because of her asthma, back pain, and legs, and limits her stair climbing to two times a day.  (R. 83, 85.)  She does not need assistance with personal care, but sometimes she gets tired and must rest.  (R. 84.)  She has difficulty driving a car because she cannot turn her neck all the way and does not drive much and does not drive long distances at all.  (R. 84.)  She no longer mows the lawn, gardens or does yard work (due to allergies and fibromyalgia); does not take out the trash (difficulty lifting); cannot clean like she used to (fatigue, pain); and has difficulty preparing/cooking meals because she cannot stand or sit for periods of time.  (R. 84-85.)  Plaintiff admits to being able to vacuum one room at a time, but must rest afterwards.  (R. 84.)  Her husband does the rest of the housework and repairs and pays the bills.  (R. 84.)  Plaintiff requires assistance with grocery shopping, as she can only carry one light weight bag and needs to rest while shopping.  (R. 84.)  Her only hobbies are reading and watching movies.  (R. 85.)  She does not participate in activities with family or friends.  (R. 87.)  Plaintiff stated she rests every day between 1:00 p.m. and 2:00 p.m. for an hour and is ready for bed after 6:00 p.m.  (R. 85.) She can walk only about one-half block without stopping or without assistance, because her legs throb and feel like they weigh 100 pounds, she has difficulty breathing due to asthma, and she has

back pain.  (R. 85, 92.)  She can sit ten to fifteen minutes, then must change position or stand due

to back and leg pain.  (R. 85.)  On occasion, she experiences pain and numbness in her fingers, which

causes her to drop things.  (R. 86.)

Plaintiff also noted that she has been experiencing fatigue and pain for 16 years, due to

fibromyalgia[6] and back problems, and that the level of fatigue and pain has increased due to these

conditions.  (R. 88, 90.)  According to Plaintiff, the fatigue is worse around 1:00 p.m. due to pain

in the back and allover, and she experiences fatigue daily; some days it last all day.  (R. 88.)  She

indicated that sleep and medication help to relieve the fatigue.  (R. 88.)  Plaintiff also experiences

pain daily and it is located mostly in her neck, upper back, shoulders, and legs, and it spreads to her

arms, buttocks, and hips, and lasts all day.  (R. 90-91.)  She feels like she has the flu and aches all

over.  (R. 90.)  Any kind of activity causes her pain, she wakes up with pain, and by 3:00 p.m. is

having difficulty walking, and getting in and out of chairs.  (R. 90.)  The pain disturbs her sleep

regularly, causing her to wake up and to walk or pace.  (R.91.)  Sometimes the pain is overwhelming

and affects her ability to think and concentrate.  (R. 91.)  For relief of her pain, Plaintiff takes

prescription medications (but they do not really help and cause her to be tired); takes muscle

---

6.  "Fibromyalgia is a clinical syndrome defined by chronic widespread muscular pain, fatigue and tenderness."  Fibromyalgia, American College of Rheumatology, *available at* http://www.rheumatology.org/public/factsheets/fibromya_new.asp?aud=pat (last visited Aug. 13, 2007).  Additional symptoms commonly experienced by people with fibromyalgia include chronic tension and/or migraine headaches, irritable bowel syndrome, overactive bladder, temporomandibular joint disorder, restless leg syndrome, disturbances of sleep, problems with memory and concentration, varying degrees of anxiety and depression, pelvic pain, premenstrual tension syndrome, sensitivity to noise, and cold intolerance.  Id.; Robert Bennett, M.D., An Overview of Fibromyalgia for Newly Diagnosed Patients, Fibromyalgia Information Foundation, *available at* http://www.myalgia.com/overview.htm (last visited Aug. 7, 2007).

relaxers; takes hot baths; goes to physical therapy; and uses a tens unit.  (R. 91-92.)  Around 1987,

Plaintiff participated in a chronic pain clinic at Northside Hospital in Ohio.  (R. 71, 92, 97.)

Finally, Plaintiff stated that she does not have any problem getting along with others, people

in authority, or with co-workers/supervisors, and claims to handle criticism well, is able to

concentrate on work for extended periods of time, and is able to accept changes at work well.  (R.

87-88.)  Plaintiff further indicated that she does not have trouble understanding and carrying out

instructions, has no problem with changes in daily routines, living arrangements, etc.; can make

decisions on her own; and usually reported to work on time.  (R. 89.)  However, when she has a

disagreement with someone, she gets upset and frustrated which causes fatigue and tiredness.  (R.

89.)  Plaintiff also stated that she did not have good work attendance due to illness and pain, she was

fired from several jobs due to missing a lot of work, and used to be able to do the work required on

her jobs but no longer could due to pain and back surgery.  (R. 87, 89.)

The second written statement provided by Plaintiff regarding limitations on her ADLs is

dated February 14, 2005 ("second ADL statement"), and indicates that while Plaintiff is able to take

care of her personal hygiene/needs,  it takes her a long time, she does not perform any household

chores, does not handle money or pay bills, does not have any hobbies but does some leisure reading

a couple of times a week for an hour, does not socialize with family or friends, and rarely drives.

(R. 105-08.)  Plaintiff also stated that she gets about six hours of interrupted sleep every night and

therefore naps all day long. (Id.)

The record also contains two letters from Plaintiff's daughter and son-in-law dated August

2, 2004 and January 27, 2005, respectively.  (R. 97-100, 104.)  In those letters, Plaintiff's daughter

and son-in-law describe their observations as to the deterioration of Plaintiff's physical and mental condition and the impact of pain on her inability to engage in any activities. (Id.)

The medical evidence shows that Plaintiff has been treated by a number of physicians, has been hospitalized on numerous occasions, and has undergone several surgeries as well as trips to the emergency room since 2001. Plaintiff has treated with Dr. Charles D'Auria, Dr. Kang, Dr. Wilson, Dr. Slivka, Dr. Deramo, Dr. Trachtman, Dr. Sagar Vihari Vallabh, M.D., and Dr. Robert Salcedo, M.D., for a variety of illnesses and conditions. She has also been evaluated at the Cleveland Clinic, and received treatment and undergone surgeries at Sharon Regional Health System and Allegheny General Hospital.

The medical records reveal that Plaintiff treated with Dr. David B. Wilson, M.D., who specializes in orthopedic surgery, from November 1999 to April 23, 2003. (R. 253-76.) He performed arthroscopic surgery to Plaintiff's left knee in November of 2001. (R. 269, 276.) He also performed an acromioplasty her right shoulder for a rotator cuff tear in September of 2002. (R. 259, 275.) Plaintiff sustained both of these injuries as a result of an incident that occurred while she was working as a teacher's aide with autistic children in May of 2001. Plaintiff made a good recovery following these surgical procedures and Dr. Wilson released her for a return to work on May 6, 2003 on light duty. (R. 253, 265-66, 277-78.) She was also treated by Dr. Wilson on several occasions in 2001 and 2002 for wrist pain and sprain. (R. 262-66, 268.) On January 9, 2002, Dr. Wilson noted that Plaintiff takes Ultram for fibromyalgia. (R. 265.)

The medical records further show that on July 26, 2002, Plaintiff was examined at Cleveland Clinic by Dr. Xisohui Fan, to obtain a second opinion regarding a neck injury she also sustained

while working as a teacher's aide.  Dr. Fan noted that Plaintiff has a diagnosis of fibromyalgia from 15 years ago that is currently being treated, and that Plaintiff had failed all of the conservative treatment measures, including physical therapy, medication, and epidural injections. An MRI of the cervical spine revealed diffuse disc dehydration and disc protrusion from the C3 through C7 level, with congenital short pedicles at C3 to C7 with resulting spinal canal stenosis.  His impression was cervical and thoracic spine sprain/strain, and exacerbation of previous degenerative disc disease of the cervical spine; congenital cervical spine stenosis; fibromyalgia; migraine headaches; and gastric ulcer.  Dr. Fan also noted that even though her neck symptoms interfere with her life on a daily basis to a moderate to severe extent, Plaintiff continued to work full-time and did not show chronic pain behavior.  He recommended she be evaluated by a spine surgeon at Cleveland Clinic to determine whether fusion surgery would be of benefit to her.  (R. 241-43, 494-95.)

The medical records also reveal that from 2002 to 2003, Plaintiff treated with Dr. James D. Kang, M.D., who specializes in  orthopedic surgery.  In November of 2002, Dr. Kang performed a cervical corpectomy and fusion at the C3 through C7 discs.  Previously, Dr. Kang diagnosed multi-level cervical stenosis.  At a follow-up visit in April of 2003, Dr. Kang noted that Plaintiff was doing well, and that she would be able to return to light duty work by May 6, 2003.  She indicated to Dr. Kang that she had actually resumed her personal care assistant job in March of 2003, where she performed housework for three individuals with ataxia.  Dr. Kang saw Plaintiff again on December 5, 2003 one year status post her multi-level anterior corpectomy for a follow-up visit.  He noted that she had some occasional neck pain but overall she was doing quite well.  He observed that her cervical range of motion was reasonably full without pain. Due to some mild mechanical neck pain,

Dr. Kang  prescribed some physical therapy to strengthen her neck.  (R. 470.)

Plaintiff's primary care physician is Dr. Charles D'Auria, D.O.  From May 29, 2001 through the date of hearing, March 18, 2005, Dr. D'Auria treated Plaintiff for multiple medical and psychological conditions, including fibromyalgia, celiac sprue, anxiety and depression, history of recurrent Lyme disease, migraine cephalgia, cervical spinal stenosis, COPD,[7] supraventricular tachycardia, and peptic ulcer disease.  (R. 455.)  Dr. D'Auria's records indicate that on numerous occasions between May 29, 2001 and March 10, 2005, he observed spasms and tenderness throughout the thoracic and cervical areas, indicating an aggravation of pre-existing fibromyalgia and a sprain of her cervical and thoracic spine, for which she takes several prescription pain medications when in distress, but which do not provide much relief.  (R. R. 313-14, 316-23, 325-27, 511.)  On four occasions from October 15, 2001 through November 30, 2001, in addition to spasms and tenderness in her cervical and thoracic spines, Dr. D'Auria found spasms and tenderness as well as multiple trigger spots in her lumbar spine and sacroiliac joints.  (R. 316-19.)  She received treatment consisting of myofacial relaxation techniques; manipulations to cervical, thoracic, lumbar areas, and sacroiliac joints; cervical traction; and arthrocentesis to sacroiliac joints. (R. 301, 307-08, 314, 316-23, 325-27.)  On several occasions beginning in January of 2003, Dr. D'Auria treated Plaintiff for a sinus infection and bronchospasm.  (R. 297, 299-300, 304-04, 311-12.)  On several occasions between April 28, 2003 and November 25, 2003, Dr. D'Auria treated Plaintiff for a sprain

---

[7]. COPD stands for chronic obstructive pulmonary disease.  Although Dr. D'Auria's report of February 7, 2005 indicates that he has treated Plaintiff for COPD, a pulmonary function study completed on February 4, 2004 was normal (R. 371-74), as was an x-ray of her chest on March 11, 2005 (R. 514).  Dr. D'Auria has, however, treated Plaintiff for asthma and allergies.

of the lumbar spine. (R. 296-97, 300-02, 306-08, 352.)  He noted tremendous spasms and tenderness throughout the thoracic and lumbar areas on April 28, 2003, which subsided to some extent after treatment. (R. 307-08.) He prescribed medication and performed myofascial relaxation techniques and manipulation to her sacroiliac joints, lumbar and thoracic spines, and performed an arthrocenteses to both sacroiliac joints.  (R. 300-02, 306-08.)  On October 15, 2003, Plaintiff presented with complaints of severe low back pain.  (R. 297.)  Dr. D'Auria observed tenderness in both sacroiliac joints and performed myofascial relaxation techniques and manipulation to both sacroiliac joints.  (Id.)  On November 25, 2003, Plaintiff again presented with severe pain in the low and mid back and neck areas, which Dr. D'Auria assessed as cervical spinal stenosis with cervical laminectomy and lumbar spinal stenosis, and treated with manipulations to her thoracic and lumbar spines and sacroiliac joints.  (R. 352.)

On October 30, 2003, Plaintiff presented with symptoms of septicemia and dehydration and Dr. D'Auria admitted Plaintiff to Sharon Regional Health System due to failure to respond to outpatient therapy.[8] (R. 296.)  During this hospitalization, Plaintiff had an EGD done which revealed a small hiatal hernia and gastritis.  (Id.)  Plaintiff saw Dr. D'Auria on November 11, 2003 as a follow-up to a recent hospitalization on November 6 - 8, 2003 for gastroenteritis with underlying celiac sprue and gastroparesis.  (R. 353.)  Plaintiff was referred to Dr. Sagar Vallabh, a gastroenterologist, for a colonoscopy, and to Dr. Deramo, an allergy specialist, due to a markedly abnormal allergy profile on October 30, 2003.  (R. 353.)   Dr. D'Auria also treated Plaintiff for

---

8.  On October 30, 2003, Plaintiff was admitted to Sharon Regional Health System because she complained of a sick stomach and severe abdominal pain.  (R. 472.)  She was diagnosed with dehydration, viral syndrome, gastritis, and treated and discharged the next day. (Id.)

fatigue on several occasions beginning in August of 2003.[9]  (R. 299, 300-03.)

On October 30, 2003, Plaintiff was examined by Dr. Sagar Vallabh, M.D., at the request of Dr. D'Auria for complaints of epigastric pain, heartburn, nausea and vomiting over the previous few months.  (R. 293-94.)  Examination of the abdomen revealed some tenderness in the epigastric area, but no palpable mass or organomegaly.  (R. 294.)  Dr. Vallabh's impression was acid peptic disease and GE reflux disease.  He ordered an upper GI endoscopy and CT scan of the abdomen, as well as other tests, and directed Plaintiff to continue to use her proton pump inhibitor.  (Id.)

On December 16, 2003, Dr. Deramo of Allergy Associates of Youngstown, an allergy and immunology specialist, completed an allergic examination on Plaintiff upon the referral of Dr. D'Auria.  (R. 469.)  Dr. Deramo reported that the allergy skin tests revealed multiple sensitivities, with the most important reactions to cat pelt, mites d. farinae, house dust, summer grasses, and ragweed.  He diagnosed her with perennial allergic rhinitis, bronchial asthma, and summer hayfever associated with bronchitis episodes and probably sinusitis, and recommended she be treated with precautionary measures and immunization.  (R. 469.)

The medical records also indicate that Plaintiff saw Dr. William Trachtman, M.D., a specialist in rehabilitative medicine, on three occasions in 2003.  (R. 480-82.)  On January 22, 2003,

---

9. Dr. D'Auria also referred Plaintiff to Dr. Robert Salcedo, M.D., who examined her on June 12, 2001, for complaints of a chronic nature, the most serious of which was falling asleep anytime, anywhere, two to three times a day, without warning for the past six months or so.  (R. 504-06.) He noted that she was working two jobs every day and kept very long hours.  He also noted that she takes multiple medications that had the potential to interfere with both her sleeping and awake time.  Dr. Salcedo reported it was unclear whether Plaintiff's sleep disorder was caused by her medications (Klonopin and Ambien in combination with muscle relaxers), possible narcolepsy, or from an underlying metabolic disorder.  Dr. Salcedo ordered tests to determine the cause of her sleep disorder, and substituted another medication for Klonopin. (R. 505-06.)

Plaintiff presented with increased pain in her right shoulder and back.  Upon examination, Dr. Trachtman observed limited shoulder and cervical range of motion and weakness throughout the right upper extremity and prescribed medication for pain and inflamation as well as physical therapy. (R. 482.) On February 19, 2003, Dr. Trachtman's records show that Plaintiff presented with similar complaints, as well as continued complaints of fatigue.  (R. 481.)  On March 20, 2003, Dr. Trachtman noted that Plaintiff was doing quite a bit better with the pain, but continued to feel tired and weak.  He observed continued improvement in her cervical range of motion and mobility, and persistent complaints of easy fatigability.  (R. 480.)  The record also shows that Plaintiff treated with Dr. Trachtman on nine other occasions between March 16, 2001 and October 17, 2002 for chronic pain in her neck, shoulders, and upper extremities, problems with sleep, and post-arthroscopic surgery to her left knee.  (R. 490-92, 499-503.)[10]

On January 28, 2004, Dr. D'Auria, Plaintiff's primary care physician, performed a consultative examination of Plaintiff for the Pennsylvania Bureau of Disability Determination.  (R. 385-94.) Dr. D'Auria noted that during this examination, Plaintiff presented with the complaint that her fibromyalgia has steadily and progressively gotten worse and is triggered by any change in the temperature or humidity; she also noted that her pain is worse with any sort of activity.  (R. 385.) When she experiences severe pain, Plaintiff stated she does get some benefit from sitting or lying down, and resting for two to three hours.  (Id.)  Plaintiff also presented with a complaint that she is getting increased pain in her upper back and neck area with pain radiating down her left arm, despite

---

10. In his office notes on March 16, 2001, Dr. Trachtman noted that Plaintiff was experiencing an increase in the frequency of migraine headaches, and that she takes Maxalt for relief.  (R. 501.)

feeling great after the cervical corpectomy and fusion in November of 2002. (R. 386.) She also reported that she is dropping things, and that she has been experiencing some numbness in her left and right hand, although the numbness is worse in the left hand. (Id.) Activity of any sort, including bending, lifting, or twisting, makes the symptoms worse. Plaintiff also complained that her asthmatic episodes are becoming more frequent and she must take more of her medication to get her lungs cleared up. (Id.) Plaintiff also indicated that she is on the gluten-free diet for treatment of her celiac sprue, but when she eats something not on the diet, she experiences diarrhea, bloating, and abdominal pain. (Id.) She also presented with a complaint of severe fatigue. (Id.) Dr. D'Auria noted she was taking the following medications: Ambien nightly; Darvocet as needed for pain; Reglan; Protonix; Ativan for anxiety; Advair; and Singulair. (R. 387.) In her social history, Dr. D'Auria noted that Plaintiff stated that in October of 2003, she was no longer physically able to perform her job and so she had to quit. She stated she was unable to predict when she was going to have a good day or bad day with the fibromyalgia and had to call off work when the pain was severe. (Id.) Plaintiff also indicated at the time of the exam that she was experiencing abdominal bloating, diarrhea and nauseousness. (R. 389.) Dr. D'Auria's examination revealed trigger spots up and down Plaintiff's cervical spine, to the suprascapular area bilaterally, as well as C3 through C7 bilaterally. He also found trigger spots at T2 and T7 bilaterally, T11, T12, and all throughout the lumbar area. He noted her cervical and thoracic muscles were spastic and tender, and that she had restricted range of motion of the cervical, thoracic and lumbar spine. (Id.) The neurological exam was unremarkable. (Id.) Dr. D'Auria's diagnosis was fibromyalgia, asthma, cervical spinal stenosis, and celiac sprue. (Id.)

14

As part of his evaluation of Plaintiff, Dr. D'Auria also completed a Medical Source Statement of Claimant's Ability to Perform Work Related Physical Activities. (R. 393 - 94.) Dr. D'Auria assessed the following exertional limitations:   (1) Plaintiff was limited to lifting and/or carrying 2-3 pounds frequently and 10 pounds occasionally; (2) Plaintiff was limited in standing and walking to four hours in  an eight-hour workday; (3) Plaintiff was limited in sitting to four hours; (4) Plaintiff was limited in pushing and pulling in the upper and lower extremities, but did not describe the nature and degree of those limitations.  (R. 393.)  With regard to postural limitations, Dr. D'Auria limited Plaintiff to occasional bending, kneeling, stooping, crouching, and balancing, and completely restricted her from climbing.  (R. 394.)  He also indicated that reaching and feeling would be affected by Plaintiff's impairments, but he did not describe the nature or degree of the limitation.  (Id.)  Finally, as to environmental restrictions, Dr. D'Auria assessed that Plaintiff would be affected by temperature extremes.  (Id.)

On March 4, 2004, Dr. Dilip S. Kar, a state Disability Determination Services ("DDS") physician, completed a Residual Functional Capacity Assessment of Plaintiff. (R. 375 - 44.) Dr. Kar determined that Plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk for six hours a day in an eight-hour workday, sit for six hours a day in an eight-hour workday, and push or pull without limitation (R. 376.).  Dr. Kar did not assess any postural, manipulative, visual, or communicative limitations.   (R. 377-79.) With regard to environmental limitations, Dr. Kar assessed several limitations due to Plaintiff's asthma, including avoiding concentrated exposure to extreme cold and heat, wetness, and humidity; avoiding even moderate exposure to fumes, odors, dusts, gases, and poor ventilation.  (R. 379.)   After noting

15

Plaintiff's documented medical impairments, Dr. Kar concluded that Plaintiff's statements regarding her limitations were partially credible.  (R. 384.)

On July 20, 2004, Plaintiff presented to Dr. D'Auria with complaints of palpitations, shortness of breath, and light chest pain.  (R. 465.)[11]  He performed an EKG in his office with showed sinus tachycardia, and had Plaintiff admitted to Sharon Regional Health System for treatment of the tachycardia and atypical chest pain.  (R. 466.)  She was treated with IV Heparin, Nitroglycerin, underwent a stress test, and received a cardiac consultation. Her telemetry readings initially showed tachycardia but resolved to normal sinus rhythm.  She was encouraged to stop smoking and to continue her outpatient medications, and was sent home on an event monitor.  (R. 464.)

On September 21, 2004, Plaintiff was admitted to Allegheny General Hospital for palpitations. (R. 407-54.) The work up identified mitral valve prolapse and evidence of supraventricular tachycardia.  (R. 408.)  An empiric slow pathway ablation was performed to alleviate the documented supraventricular tachycardia.    (Id.)   The next day, a follow-up electrocardiogram showed no change from the baseline test; she remained stable and was discharged. (Id.)  The ablation ultimately proved to be unsuccessful.  (R. 512.)

On December 15, 2004, Dr. Adam Slivka, a specialist in gastroenterology, conducted a follow-up evaluation of Plaintiff at the Digestive Disorders Center. (R. 460 - 61.)  Five years earlier,

---

11. Dr. D'Auria noted that she was also started on antibiotic treatment for Lyme disease.  (R. 465.)

Dr. Slivka diagnosed Plaintiff with celiac sprue and she was placed on a gluten-free diet.[12]  He noted that she had been noncompliant with the gluten-free diet  and that some of her symptoms were explained by this noncompliance.   Dr. Slivka instructed her to stay on a strict gluten-free diet. Plaintiff suffered from episodic epigastric pain radiating to the right upper quadrant. She had nausea, vomiting, and diarrhea.  Her complaints were consistent with gastroparesis, which she was diagnosed with years prior, although her abdominal exam was entirely benign. She had discontinued Reglan for unknown reasons and Dr. Slivka asked her to restart it. Dr. Slivka noted that Plaintiff was "well appearing."  (R. 460-61.)

On February 7, 2005, Dr. D'Auria provided a report updating the status of Plaintiff's conditions and her return to work prognosis. (R. 455-56.) Dr. D'Auria indicated that he was treating Plaintiff for fibromyalgia, celiac sprue, anxiety and depression, history of recurrent Lyme disease, migraine cephalgia, cervical spinal stenosis, COPD, supraventricular tachycardia, and peptic ulcer disease.[13] (R. 455.)  According to Dr. D'Auria, Plaintiff was taking Singulair, Advair, and Allegra for severe lung disease; Reglan and Protonix for peptic ulcer disease; Ativan and Ambien for anxiety, depression, and subsequent insomnia; Toprol XL for supraventricular tachycardia; and Darvocet for severe pain from fibromyalgia. (Id.)  Dr. D'Auria further reported that he considered

---

12.  Celiac sprue is a "hereditary disorder caused by sensitivity to … gluten", which is a protein in wheat.  Symptoms vary but usually include diarrhea and abdominal discomfort. The Merck Manuals Online Medical Library, The Merck Manual for Healthcare Professionals (*available at* http://www.merck.com/mmpe/sec02/ch017/ch017d.html#sec02-ch017-ch017d-1051).

13.     The record indicates that Plaintiff has a history of fibromyalgia, gastric problems,  and recurrent Lyme disease dating back to 1996.  ( R. 117-18, 122, 128-29, 142-44, 152-53, 156, 159, 161-63, 166-68, 171-72, 178-80, 182-83.)

Plaintiff to be "in a non-work status due to the multiple underlying problems she is experiencing." (Id.)  Dr. D'Auria opined that Plaintiff would "never recover from her multiple medical problems to a point where she could seek and maintain gainful employment." (R. 456.)  He also felt that Plaintiff met the criteria for Listing 12.04 for chronic depression and anxiety.[14] (Id.)

In support of his opinion, Dr. D'Auria attached additional medical records (R. 460-506), as well as his assessment of the effect of Plaintiff's impairments on her mental/emotional capabilities as related to her ability to do work-related activities on a day-to-day basis in a regular work setting, dated February 6, 2005 (R. 457-59.)  With regard to occupational adjustments, Dr. D'Auria rated Plaintiff as "good"[15] in her ability to follow work rules, relate to co-workers, deal with the public, use judgment, and interact with a supervisor.  (R. 457-58.)  He rated her as "fair"[16] with regard to her ability to function independently.  (R. 458.)  However, he gave her a rating of "poor to none"[17] with regard to her ability to deal with work stresses and to maintain attention/concentration.  (Id.)  As to performance adjustments, Dr. D'Auria rated Plaintiff as "fair" with regard to her ability to understand, remember, and carry out complex, detailed but not complex, or simple job instructions.  (Id.)  Finally, with regard to personal/social adjustments, Dr. D'Auria rated Plaintiff's ability to

---

14. Dr. D'Auria was referring to the Listing of Impairments contained in 20 C.F.R., Pt. 404, Subpt. P, App. 1 (2005).

15. A rating of "good" means the "[a]bility to function in this area is limited but satisfactory." (R. 457.)

16. A rating of "fair" means the Plaintiff's "[a]bility to function in this area is seriously limited, but not precluded.  (R. 457.)

17. A rating of "poor to none" means Plaintiff has "[n]o useful ability to function in this area." (R. 457.)

18

maintain personal appearance and relate predictably in social situations as "good," but gave only a "fair" rating to her ability to behave in an emotionally stable manner and to demonstrate reliability. (R. 459.)

Subsequently, on February 28, 2005, March 2, 2005, and March 10-11, 2005, Dr. D'Auria treated Plaintiff for severe palpitations and tachycardia. (R. 507, 512, 515.)  On February 28, 2005, Plaintiff visited the outpatient department of Sharon Regional Hospital for application of a 24-hour Holter monitor.  The 24-hour Holter monitor report suggested atrial tachycardia. (R. 507.)  On March 10, 2005, Plaintiff saw Dr. D'Auria in his office where she presented with complaints of rapid heart beat and palpitations.  (R. 511.)  His examination revealed that the cervical and thoracic muscles were tender and spastic, and that Plaintiff was symptomatic for supraventricular tachycardia.  (R. 511.)  Dr. D'Auria noted that since he changed her heart medication on March 2, 2005, Plaintiff had been much worse with much increased palpitations, severe fatigue and sleepiness.  (R. 512.)  Dr. D'Auria admitted her to the hospital for observation overnight with a change in her medications. (R. 513.)  Normal sinus rhythms were observed throughout the night and Plaintiff was discharged on March11, 2005.  (R. 520.)  Dr. D'Auria's office note on March 14, 2005 indicates that Plaintiff was feeling a lot better and her  heart beat was less rapid.  (R. 510.)  He continued her on the same medications and she was to return in a month.  (Id.)

A hearing was held before the ALJ on March 18, 2005, at which time Plaintiff testified as to her limitations and the effect of her medical conditions on her ability to function.  (R. 575-89.) Essentially, her testimony mirrored the information on the two written statements given regarding the effect of her medical impairments on her ADLs.  In addition, Plaintiff provided updated

19

information regarding her various medical conditions.  In particular, Plaintiff testified that she has difficulty sticking with the gluten-free diet prescribed for her celiac sprue, due to problems with getting the food and cross-contamination (which occurred mostly if she was eating out in a restaurant).  (R. 575.)  In addition to the celiac sprue, Plaintiff stated she also suffers from other gastric problems and diarrhea, for which she takes prescription medication.  (Id.)  She also testified that due to her asthma, by 5:00 p.m. each day, she has a hard time breathing and begins wheezing and, in addition to her medication and inhalers, she uses a  nebulizer for 15 minutes, four times a day.  (R. 576, 586.)  She also testified that to get rid of the migraine headaches she gets three to four times a week, she sleeps and takes Advil.  (R. 576-77.)  Plaintiff also testified that she was currently being treated for atrial tachycardia with medication to regulate her heartbeat, and that she was recently hospitalized for this condition.  (R. 577-78.)   In addition, Plaintiff testified that while she initially got some relief from the neck surgery, the pain started to come back a few months later, and that she has other problems consisting of spinal stenosis and two bulging discs–one in her neck and the other in her lower back.  (R. 579-80, 582.)  The pain in her neck radiates down her shoulders and arms, and her hands get numb and tingle, causing her to drop things,[18] and the pain in her back radiates down her legs.  (R. 582, 587-88.)  She also testified that sometimes her hip goes out of place and she has trouble walking.  (R. 582.)  She had an appointment to see Dr. Kang for her neck and back problems in December of 2004, but had to cancel the appointment.  (R. 580.)  Plaintiff also testified that she has recurring Lyme disease, which causes confusion, achiness, and forgetfulness,

---

18.  Plaintiff also testified that she was diagnosed with osteoarthritis in her fingers, which prevents her from any manipulative work or activities, like knitting or sewing.  (R. 588.)

20

and for which she takes antibiotics.  (R. 580.)  She also described symptoms of depression and anxiety that she experienced,[19] and indicated that Dr. D'Auria provides treatment for this in the form of medication.  (R. 581.)    Plaintiff testified that she has had allergic reactions to a number of her medications, and has experienced side effects to other medications, such as tiredness, dizziness, and nauseousness, but mostly tiredness.  (R. 586.)  She complained about the tiredness and the doctors changed her medication.  (Id.)  With regard to exertional limitations, Plaintiff testified that her conditions limit her to sitting for 15 minutes, then she needs to stand or lay down; she can stand for 5 to 10 minutes, and then must rest; and walking is limited to short distances.  (R. 587.)  During an eight-hour day, Plaintiff testified that she probably spends at least 6 ½ hours lying down.  (R. 588-89.)  Finally, Plaintiff testified that she is only able to sleep a couple of hours at night, then she gets up and paces a little bit, then lays back down.  (R. 588.)

A Vocational Expert ("VE"), Dr. Noel Plummer, also testified at the hearing on March 18, 2005, regarding whether any jobs existed in the national economy for an individual with Plaintiff's age, education and past relevant work experience, and RFC.  (R. 589-93.) The ALJ posed two hypothetical questions to the VE.  First, the ALJ asked whether employment existed for a person with Plaintiff's age, education and work experience, who can lift no more than ten pounds occasionally; who can stand or walk for about four hours during a workday and sit for about four hours per workday, with a sit or stand option at thirty minute intervals; who cannot climb but can

---

19.  Plaintiff stated that her depression had affected her ability to concentrate.  By way of example, Plaintiff stated she almost caused a house fire on two occasions when she left water to boil on the stove, walked away and forgot about it.  (R. 582.)  On February 6, 2005, Dr. D'Auria rated her ability to maintain attention/concentration as "poor to none."  (R. 458.)

perform other normal posture maneuvers occasionally; who cannot perform repetitive reaching or pulling away from the body or repetitive fine motor movements. (R. 591.) The VE opined that jobs existed for such a person in the national economy. (Id.) The ALJ followed up with a second hypothetical and inquired whether the individual could still perform those jobs, assuming the limitations in the first question and adding that the individual is limited to simple and repetitive activities that do not involve dealing with the general public, or closely interacting with co-workers, or engaging in similar sources in a high level of workplace stress. (R. 591 - 92.) The VE responded that the individual could not perform one of the jobs in his first response, but could still do the rest. (R. 592.)

In addition, Plaintiff's attorney asked the VE whether jobs were available for an individual who, like the Plaintiff testifed, needed to lay down six out of eight hours a day. (Id.) The VE responded that there were no jobs available for such a person. (R. 593.) Plaintiff's attorney followed up with another question that inquired whether the VE would change his opinion regarding the jobs available to the hypothetical individual presented by the ALJ if, assuming an individual the claimant's age, education, work experience, who could lift no more than ten pounds occasionally, who could stand or walk for no more than ten or fifteen minutes or sit for fifteen to thirty minutes at a time, and who could sit or stand for no more than six hours in a day. (Id.) The VE responded that such an individual "would be unable to perform any jobs in the national economy on a sustained competitive basis." (Id.)

C.    **"Substantial Evidence" Standard of Review**

In reviewing an administrative determination of the Commissioner, the question before any

court is whether there is substantial evidence in the agency record to support the findings of the

Commissioner.  42 U.S.C. § 405(g).  See also, e.g., Richardson v. Perales, 402 U.S. 389 (1971);

Adorno v. Shalala, 40 F.3d 43 (3d Cir. 1994).

More specifically, 42 U.S.C. § 405(g) provides:

> The court shall have power to enter, upon the pleadings and transcript
> of the record, a judgment affirming, modifying, or reversing the
> decision of the Commissioner of Social Security, with or without
> remanding the cause for a rehearing. The findings of the
> Commissioner of Social Security as to any fact, if supported by
> substantial evidence, shall be conclusive . . .

Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion." Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1000) (citing

Pierce v. Underwood, 487 U.S. 552, 565 (1988)); Plummer v. Apfel, 186 F.3d 422 (3d Cir. 1999).

Although there may be contradictory evidence in the record, and/or although this Court may have

found otherwise, it is not cause for remand or reversal of the Commissioner's decision if substantial

support exists. Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000).

The Third Circuit has noted that evidence is not substantial "if it is overwhelmed by other

evidence - particularly certain types of evidence (e.g., that offered by treating physicians) - or if it

really constitutes not evidence but mere conclusion." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir.

1983); see also Gilliland v. Heckler, 786 F.2d 178, 183 (3d Cir. 1986) (citing Kent, supra).  In

addition, despite the deference due to administrative decisions in disability benefit cases, "appellate

courts retain a responsibility to scrutinize the entire record and to reverse or remand if the

[Commissioner]'s decision is not supported by substantial evidence."  Smith v. Califano, 637 F.2d

968, 970 (3d Cir. 1981).  Finally, the "grounds upon which an administrative order must be judged

are those upon which the record discloses that its action was based."  <u>Fargnoli v. Massanari</u>, 247

F.3d 34, 44 n. 7 (3d Cir. 2001) (quoting <u>SEC v. Chenery</u>, 318 U.S. 80, 87 (1943)).

### D.    **Disability Evaluation**

The issue before the Court for immediate resolution is a determination of whether there is

substantial evidence to support the findings of the Commissioner that Plaintiff was not disabled

within the meaning of the Act, but had the residual capacity to perform a form of substantial gainful

employment.

The term "disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> inability to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which can be
> expected to result in death or which has lasted or can be expected to
> last for a continuous period of not less than 12 months . . .

The requirements for a disability determination are provided in 42 U.S.C. § 423(d)(2)(A):

> An individual shall be determined to be under a disability only if his
> physical or mental impairment or impairments are of such severity
> that he is not only unable to do his previous work but cannot,
> considering his age, education, and work experience, engage in any
> other kind of substantial gainful work which exists in the national
> economy, regardless of whether such work exists in the immediate
> area in which he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for work.  For
> purposes of the preceding sentence … work which exists in the
> national economy' means work which exists in significant numbers
> either in the region where such individual lives or in several regions
> of the country.

A "physical or mental impairment" is "an impairment that results from anatomical,

physiological, or psychological abnormalities which are demonstrable by medically acceptable

clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).[20]

Finally, the applicable regulations set forth a more explicit five-step evaluation to determine disability.  The regulations, published at 20 C.F.R. §§ 404, 1501-29, set forth an orderly and logical sequential process for evaluating all disability claims.[21]  In this sequence, the ALJ must first decide whether the plaintiff is engaging in substantial gainful activity.  If not, then the severity of the Plaintiff's impairment must be considered.  If the impairment is severe, then it must be determined whether she meets or equals the "Listings of Impairments" in Appendix 1 of the Regulations which the Commissioner has deemed of sufficient severity to establish disability.  If the impairment does not meet or equal the Listings, then it must be ascertained whether Plaintiff can do her past relevant work.  If not, then the residual functional capacity ("RFC") of the plaintiff must be ascertained, considering all the medical evidence in the file to assess whether the Plaintiff has the ability to

---

20.    In reviewing a disability claim, the Commissioner must consider subjective symptoms as well as the medical and vocational evidence.  See Green v. Schweiker, 749 F.2d 1066, 1068 (3d Cir. 1984) (explaining that "subjective complaints of pain [should] be seriously considered, even where not fully confirmed by objective medical evidence"); Bittel v. Richardson, 441 F.2d 1193, 1195 (3d Cir. 1971) ("Symptoms which are real to the claimant, although unaccompanied by objective medical data, may support a claim for disability benefits, providing, of course, the claimant satisfies the requisite burden of proof.") (citations omitted).

       In assessing a plaintiff's subjective complaints, the ALJ may properly consider them in light of the other evidence of record, including objective medical evidence, plaintiff's other testimony, and plaintiff's description of her daily activities.  See Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999).  And so long as a plaintiff's subjective complaints have been properly addressed, the ALJ's decisions in that regard are subject only to the substantial evidence review discussed in Section C, supra.  See Good v. Weinberger, 389 F. Supp. 350, 353 (W.D. Pa. 1975) (discussing Bittel and concluding that where "plaintiff did not satisfy the fact finder in this regard, so long as proper criteria were used, [it] is not for us to question"); see also Kephart v. Richardson, 505 F.2d 1085, 1089 (3d Cir. 1974) (noting that credibility determinations of ALJ are entitled to deference).

21.    This evaluation process has been repeatedly reiterated with approval by the United States Supreme Court.  See, e.g., Barnhart v. Thomas, 540 U.S. 20, 25-25 (2003).

25

perform other work existing in the national economy in light of the Plaintiff's age, education, and past work experience.[22]

The finding of the ALJ that Plaintiff is unable to perform her past relevant work will satisfy Plaintiff's burden and then the burden shifts to the Commissioner to show that other work exists in significant numbers in the national economy that accommodates her residual functional capacity. See 20 CFR § 404.1520; Green v. Schweiker, 749 F.2d 1066, 1071 (3d Cir. 1984).[23]  Thus, it must be determined whether or not there is substantial evidence in the record to support the ALJ's conclusion that Plaintiff was not disabled within the meaning of the Social Security Act.

E.      **Analysis**

1.      **The ALJ's Credibility Finding Is Not Supported by Substantial Evidence**

Plaintiff argues that the ALJ erred in determining that Plaintiff's testimony was not entirely credible and failed to comply with the requirements of Social Security Ruling 96-7p, July 2, 1996, in evaluating the credibility of Plaintiff's subjective complaints.  Specifically, Plaintiff argues that the ALJ failed to follow SSR 96-7p because the ALJ gave nothing more than a conclusory statement

22.     The finding of residual functional capacity is the key to the remainder of findings under the regulations.  If the plaintiff's impairment is exertional only, (i.e. one which limits the strength she can exert in engaging in work activity), and if her impairment enables her to do sustained work of a sedentary, light or medium nature, and the findings of age, education and work experience, made by the ALJ coincide precisely with one of the rules set forth in Appendix 2 to the regulations, an appropriate finding is made.  If the facts of the specific case do not coincide with the parameters of one of the rules, or if the plaintiff has mixed exertional and non-exertional impairments, then the rules in Appendix 2 are used as guidelines in assisting the ALJ to properly weigh all relevant medical and vocational facts.  See 20 C.F.R. § 404.1569; 20 C.F.R. pt. 404, subpt. P, app., § 200.00(a).

23.     The Commissioner may establish that jobs for a particular claimant exist in the national economy in several ways, including by way of the testimony of a vocational expert.  See Jesurum v. Sec'y of U.S. Dep't of Health & Human Serv., 48 F.3d 114, 121 (3d Cir. 1995).

as an explanation for his finding that Plaintiff was not entirely credible, and the ALJ failed to make specific findings regarding Plaintiff's subjective complaints of pain as required under SSR 96-7p. (Pl.'s Br. at 15-21.)   Plaintiff further contends that had the ALJ evaluated Plaintiff's subjective complaints of pain in accordance with SSR 96-7p, he would have found that Plaintiff's chronic pain was corroborated by medical evidence and was therefore credible. (Pl.'s Br. at 16 – 21.) In response, Defendant argues that the ALJ's credibility determination is supported by substantial evidence, because the ALJ properly discussed all of the relevant factors. (Def.'s Br. at 13-14.)[24] A close review of the ALJ's decision reveals, however, that the ALJ failed to discuss, let alone evaluate under SSR 96-7p, Plaintiff's subjective complaints of pain in reaching his determination at Step 4 of the evaluation process.  The Court agrees with Plaintiff that the ALJ did not comply with SSR 96-7p with regard to Plaintiff's subjective complaints of pain.

In making a determination of a claimant's residual functional capacity, the ALJ is required to consider a claimant's subjective complaints and the extent to which those complaints can reasonably be accepted as consistent with the objective medical evidence and other evidence in the record.   Schwartz v. Halter, 134 F.Supp.2d 640, 653 (E.D.Pa. 2001) (citing 20 C.F.R. §§ 404.1529(a), 416.929(a)).  The ALJ is obligated to seriously consider subjective complaints of pain

---

24.  In her brief, Defendant goes through the analysis required under SSR 96-7p and then submits that the Plaintiff's allegations of total disability are not credibly supported by the medical evidence.  Therefore, Defendant argues, the ALJ's credibility finding is supported by substantial evidence.  (Def.'s Br. at 15-17.)  Defendant cannot provide the analysis that the ALJ failed to provide and then argue that the ALJ's decision is supported by substantial evidence.  Foley v. Barnhart, 432 F.Supp. 2d 465, 477 (M.D.Pa. 2005) (citing Fargnoli v. Massanari, 247 F.3d 34, 42 (3d Cir. 2001)) (holding the Commissioner's after-the-fact analysis in her brief on appeal cannot substitute for the ALJ's missing analysis).

or other symptoms,[25] even where those complaints are not supported by objective evidence.  Id.
(citing Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993) (citing Ferguson v. Schweiker, 765
F.2d 31, 37 (3d Cir. 1985))).  Although objective evidence of pain or other symptoms is not required,
objective medical evidence must show the claimant has a medical impairment(s) which could
reasonably be expected to produce the pain or other symptoms.  Schwartz, 134 F.Supp.2d at 653
(citing Green v. Schweiker, 749 F.2d 1066, 1070-71 (3d Cir. 1984)); Ferguson v. Schweiker, 765
F.2d 31, 37 (3d Cir. 1985) (citation omitted).  If medical evidence exists that supports a claimant's
complaints of pain or other symptoms, the complaints are entitled to great weight and may not be
disregarded unless contrary medical evidence exists.  Schwartz, 134 F.Supp.2d at 653-54 (citing
Mason, 994 F.2d at 1067-68 (citing Carter v. R.R. Ret. Bd., 834 F.2d 62, 65 (3d Cir. 1987);
Ferguson, 765 F.2d at 37)); see also Green v. Schweiker, 749 F.2d 1066, 1070 (3d Cir. 1984); Smith
v. Califano, 637 F.2d 968, 972 (3d Cir. 1981).  In addition, when a claimant's subjective testimony
of his inability to perform even light or sedentary work is supported by competent medical evidence,
the ALJ is required to give great weight to the claimant's testimony.  Id. at 654 (citing Schaudeck
v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 433 (3d Cir. 1999)) (other citation omitted).
"Moreover, a claimant is entitled to substantial credibility if [s]he has a work record of continuous
employment for a substantial duration of time."  Morrow v. Apfel, No. 99-732-SLR, 2001 WL
641038, *10 n.9 (D. Del. Mar.16, 2001) (citing Bazemore v. Heckler, 595 F.Supp. 682, 688 (D. Del.
1984)) (holding claimant should be accorded substantial credibility as he owned his own business
for 15 years.)

---

[25]. Subjective complaints are not limited to pain, but may also include other symptoms, such as
fatigue, shortness of breath, weakness or nervousness.  20 C.F.R. § 404.1529(b).

The regulations set forth a two-step process for evaluating symptoms, such as pain and fatigue, and the extent to which the claimant's symptoms affect her ability to do basic work activities. First, the ALJ must consider whether there is objective medical evidence in the record of a physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms. 20 C.F.R. § 404.1529(b); SSR 96-7p. Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the symptoms has been established, then the ALJ must evaluate the intensity, persistence, and limiting effects of these symptoms on a claimant's ability to do basic work activities. 20 C.F.R. § 404.1529(c); SSR 96-7p. If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairments could not be reasonable expected to product the claimant's symptoms, then the symptoms cannot be found to affect the claimant's ability to do basic work activities. SSR 96-7p.

In evaluating the intensity and persistence of a claimant's symptoms, the ALJ must "consider all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements from [the claimant], his treating or examining physician or psychologist, or other persons about how [the] symptoms affect [the claimant], . . . and the medical opinions of [the claimant's] treating source and other medical opinions." 20 C.F.R. § 404.1529(c)(1). The ALJ must also consider and weigh all of the non-medical evidence such as information about the claimant's prior work record, observations by SSA employees and other persons. 20 C.F.R. § 404.1529(c)(3); Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 122 (3d Cir. 2000)(citations omitted). Finally, the ALJ must take into consideration factors relevant to the

claimant's pain or other symptoms, such as: (1) the claimant's daily activities; (2) the location,

duration, frequency, and intensity of the claimant's symptoms; (3) precipitating and aggravating

factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate the

symptoms; (5) treatment, other than medication, received for relief of the symptoms; (6) measures

used to relieve the symptoms; (7) other factors relating to the claimant's functional limitations and

restrictions due to the symptoms.  SSR 96-7p (citing 20 C.F.R. § 404.1529(c)) (other citation

omitted).

> In undertaking this evaluation, the ALJ is required to articulate the reasons for his credibility

findings.  In particular, SSR 96-7p provides:

> > It is not sufficient for the adjudicator to make a single, conclusory
> > statement that "the individual's allegations have been considered" or
> > that "the allegations are (or are not) credible."  It is also not enough
> > for the adjudicator simply to recite the factors that are described in the
> > regulations for evaluating symptoms.  The determination or decision
> > must contain specific reasons for the finding on credibility, supported
> > by the evidence in the case record, and must be sufficiently specific
> > to make clear to the individual and to any subsequent reviewers the
> > weight the adjudicator gave to the individual's statements and the
> > reasons for that weight.

See also Fargnoli, 247 F.3d at 41 (citations omitted) (in determining claimant's RFC, ALJ must

review all relevant medical and non-medical evidence and explain his conciliations and rejections);

Burnett, 220 F.3d at 121-22 (citations omitted) (same).

> Here the ALJ states in his findings that "[Plaintiff's] allegations regarding her limitations are

not totally credible for the reasons and to the extent set forth in the body of the decision."  (R. 21.)

From the body of the decision, it appears that the ALJ proffered two specific bases for finding

Plaintiff's allegations of limitation not entirely credible.  However, the explanations given by the

ALJ are undermined by the record and his failure to take into consideration other possible factors supporting Plaintiff's allegations of limitation, and are predicated on inaccurate assumptions about Plaintiff's work history.  In addition, the ALJ failed to address Plaintiff's subjective complaints of pain and fatigue.

The first basis given by the ALJ for finding Plaintiff's allegations regarding her limitations not entirely credible centers on a perceived inconsistency between Plaintiff's testimony at the hearing on March 18, 2005, to the extent Plaintiff implied she was not capable of performing any work, and her decision to turn down a light duty position in a prison offered to her almost two years earlier, based on her husband's concern about the prison environment.  (R. 18.)  This basis is not supported by the record for two reasons.  First, the ALJ's explanation confuses the facts as it does not recognize that the lighter duty position was offered as an alternative to her job as a teacher's aide, not as an alternative to her personal care attendant position.  The record clearly shows that Plaintiff was working two jobs simultaneously in 2003 prior to her AOD,[26] namely, as a personal care attendant and as a teacher's aide.  The record further shows that Plaintiff had returned to work as a personal care assistant on March 20, 2003 and continued to work in that job even after she turned down the school district's offer of the lighter duty job at the prison sometime prior to August of 2003.[27]

---

26.  AOD refers to alleged onset of disability which, in this case, is October 19, 2003.

27.  Plaintiff did not attempt to return to her job as a teacher's aide until she was released to return to work on May 6, 2003, and then she experienced difficulty with performing her job as a teacher's aide, even after the school district provided her with assistance.  The school district prevented her from continuing to work as a teacher's aide, as it felt her three surgeries prevented her from being able to perform the duties of the job.  The school district then offered her the lighter duty position at the prison, which she turned down.  According to the Work History Report, Plaintiff last worked for the school district in August of 2003.  As to her other job as a personal care attendant, Plaintiff continued to work at that job until her AOD in October 2003,

Second, the ALJ's basis focuses solely on Plaintiff's rejection of the light duty job, which appears

to have occurred sometime prior to August 2003, and fails to recognize any treatment and worsening

of Plaintiff's conditions between her rejection of that job offer and her AOD and/or the hearing on

March 18, 2005.[28]  Since October of 2003, the record shows an exacerbation of her fibromyalgia,

cervical spinal stenosis, asthma, and problems with supraventricular tachycardia.  Thus, just because

she may have turned down a lighter duty position in 2003 prior to her AOD  for reasons not related

to her disability, that does not mean she was not disabled at her AOD or at the time of the hearing,

almost 18 months later.  Indeed, there is no evidence in the record actually describing the duties of

the prison job she was offered and turned down.  It is entirely possible that these duties involve an

exertional level above what she was able to perform.  Therefore, the ALJ's focus on the Plaintiff's

decision to turn down the prison job, without considering these other factors, is not sufficient to

discount her credibility, especially in light of the other infirmities with the ALJ's evaluation of

Plaintiff's credibility, as noted below.

The second basis provided by the ALJ for not finding Plaintiff entirely credible was his

determination that no evidence of any medical impairment relating to the hip or lumbar spine existed

in the record to support Plaintiff's complaints of low back problems and hip displacement.  (R. 18.)

However, an examination of the record belies this finding.  The record establishes and the ALJ

when the duties of that job were too physically demanding for her to perform (the VE
characterized this job as very heavy in exertional demand).

28.  For example, the ALJ does not appear to give any consideration to Plaintiff's statement in her
claim for disability that she missed a lot of work due to pain, [being] tired and fatigue[d] all the
time," and that she was fired from jobs because of her frequent absences, which is supported by
the diagnosis and treatment of fibromyalgia, Lyme disease, cervical spinal stenosis,
gastropareses, and tachycardia.

concedes that Plaintiff suffers from fibromyalgia, a severe impairment under the regulations.[29]  The

diagnosis of fibromyalgia is based on the classification criteria developed by the American College

of Rheumatology ("ACR") in 1990 and includes two aspects: (1) a history of widespread pain in all

four quadrants of the body for a minimum duration of three months; and (2) at least 11 of the 18

specified tender points which cluster around the neck, shoulder, chest, hip, knee, and elbow regions.

Fibromyalgia Information Foundation, Diagnosing Fibromyalgia, *available at*

http://www.myalgia.com/Diagnosis/Intro.htm (last accessed Aug. 7, 2007); Social Security

Memoradum, supra.  The record documents repeated observations and treatment of spasms and

tenderness throughout Plaintiff's cervical, thoracic and lumbar spine and sacroiliac joints.  During

his consultative examination performed on January 28, 2004, Dr. D'Auria noted in his physical

examination of Plaintiff multiple trigger spots along the cervical, thoracic, and lumbar spine.  Thus,

the diagnosis of fibromylagia, which the ALJ accepted and listed as a severe impairment, is sufficient

to support Plaintiff's complaints of lower back and hip problems.  Accordingly, the ALJ's second

---

29. SSA has recognized fibromyalgia as a medically determinable impairment where certain "signs" are clinically established by the medical record.  Susan M. Daniels, Ph.D., Social Security Memorandum: Fibromyalgia, Chronic Fatigue Syndrome Objective Medical Evidence Requirements for Disability Adjudication (May 11, 1998), *available at* http://www.myalgia.com/SSA%20memorandem%20on%20FM.htm) ("Social Security Memorandum").  Citing the American College of Rheumatology ("ACR"), the SSA explained:

> The signs primarily are the tender points.  The ACR defines the disorder in patients as "widespread pain in all four quadrants of the body for a minimum duration of 3 months and at least 11 of the 18 specified tender points which cluster around the neck and shoulder, chest, hip, knee, and elbow regions."  Other typical symptoms, some of which can be signs if they have been clinically documented over time, are irritable bowel syndrome, chronic headaches, temporomandibular joint dysfunction, sleep disorder, severe fatigue, and cognitive dysfunction.

Id.

33

basis for discounting  Plaintiff's credibility is not supported by substantial evidence.

Even more problematic is the ALJ's failure to provide <u>any</u> evaluation of Plaintiff's subjective complaints of pain and fatigue.  Clearly, such failure does not comply with the requirements of <u>SSR 96-7p</u>.  The record contains a diagnosis of fibromyalgia, cervical spinal stenosis, and supraventricular tachycardia, which are medical impairments that result from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce chronic pain, tiredness, and/or fatigue, as alleged by Plaintiff.  The record reveals that Plaintiff was diagnosed with fibromyalgia in or around 1986, and Dr. D'Auria's office notes indicate that Plaintiff has been treated for this condition with medication, injections, physical therapy, and manipulations. Plaintiff also testified she attended a chronic pain clinic at Northside Hospital in or around 1987. (R. 71.)  The record also shows she was diagnosed with cervical spinal stenosis and underwent a cervical corpectomy and fusion at C3 through C7 in 2002, but continues to have problems.  In the months immediately preceding the hearing, and as recent as one week before the hearing, Plaintiff was hospitalized to regulate her heart beat due to supraventricular and atrial tachycardia.  The ALJ acknowledged and accepted these diagnoses at Step 3 of the evaluation process, where he included fibromyalgia, cervical disc disease, status post-fusion, and supraventricular tachycardia as three of the severe medical impairments documented by the medical evidence. (R. 17.)

Plaintiff alleges that the daily pain she experiences from her fibromyalgia, cervical spinal stenosis, gastroparesis, and the resulting fatigue from not being able to sleep, is so severe that she is unable to perform even sedentary work on a regular basis, for eight hours a day.  Therefore, the ALJ was required to evaluate her subjective complaints under the standards set forth in <u>SSR 96-7p</u>

and the regulations cited above.  His failure to do so constitutes legal error and causes this Court to conclude his credibility finding at Step 4 is not supported by substantial evidence.

Accordingly, the Court recommends that this case be remanded to the ALJ for a proper assessment of Plaintiff's credibility in light of this report and recommendation.[30]  On remand, the ALJ must consider and evaluate all of Plaintiff's subjective complaints, including pain and fatigue, and their effect on her ability to perform other relevant work.  In conducting this evaluation, the ALJ may want to further develop the record by requesting either Plaintiff's treating physician, Dr. D'Auria, or a rheumatologist to complete a Fibromyalgia Residual Functional Capacity Questionnaire, to assist him with determining Plaintiff's RFC in light of her subjective complaints.

---

[30].  Several district courts in this Circuit have found reversible error where the claimant suffers from fibromyalgia and the ALJ rejects claimant's allegations of pain because the ALJ found no support from objective medical testing.  Foley v. Barnhart, 432 F.Supp.2d 465, 480 (M.D.Pa. 2005) (citing Green-Younger v. Barnhart, 335 F.3d 99, 108 (2d Cir. 2003) (holding "in a disability determination involving fibromyalgia, it is error to require objective findings when the disease itself eludes such measurement"); Perl v. Barnhart, No. 03-4580, 2005 WL 579879, * 5 (E.D.Pa. Mar. 10, 2005) (citing Justino v. Barnhart, No. 01-4902, 2002 WL 31371988, at *7 (E.D.Pa. Oct. 21, 2002); Alvarado v. Chater, No. 96-2710, 1997 WL 43008, at *3 (E.D.Pa. Jan. 24, 1997)).  A methodology which relies on the presence or absence of physiological medical tests to confirm a claimant's impairment in determining her RFC ignores the reality of fibromyalgia and the diagnostic technique employed to objectively determine the existence and severity of fibromyalgia, i.e., tender point evaluation and clinical documentation of a claimant's symptoms by treating physicians.  Perl, 2005 WL 579879, at *5 (citing Preston v. Sec'y of Health & Human Serv., 854 F.2d 815, 817-18 (6th Cir. 1988); Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996); SSR 96-4p at n.2 (July 2, 1996); Social Security Memorandum, supra).  Stated another way, unverified subjective complaints consistent with fibromyalgia cannot be discredited due to lack of objective evidence.  Foley, 432 F.Supp.2d at 480 (citing Green-Younger, 335 F.3d at 108).  "Rather, a doctor's diagnosis of fibromyalgia bolsters the credibility of the plaintiff's complaints."  Id.  (citing Green-Younger, supra).  In the present case, the ALJ is advised to keep this in mind on remand when evaluating Plaintiff's subjective complaints.

### 2. The ALJ's Analysis of the Medical Evidence

Next, Plaintiff submits that the ALJ failed to properly analyze the medical evidence and therefore his findings are not supported by substantial evidence. Specifically, Plaintiff argues that the reports and opinions of Dr. D'Auria and Dr. Trachtman[31] should be given great weight because they treated Plaintiff extensively, and because all of the treating physicians' records were consistent with each other and with Plaintiff's subjective testimony. (Pl.'s Br. at 23.) Plaintiff acknowledges that while the ultimate determination of disability is reserved to the Commissioner, nevertheless the ALJ is not at liberty to disregard the treatment records of Dr. D'Auria in their entirety. (Id.) The Court concludes that Plaintiff's argument has some merit.

In determining eligibility for disability benefits, the ALJ is required to accord the reports of the treating physicians great weight, especially "'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Morales v. Apfel,* 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Plummer v. Apfel,* 186 F.3d 422, 429 (3d Cir. 1999)) (other citations omitted). If the "opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ must choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" *Id.* at 317 (quoting *Plummer,* 186 F.3d at 429) (other citation omitted). The ALJ is required to consider the medical findings that support the opinion of a treating physician that the claimant is disabled. *Id.* (citation omitted). If the ALJ chooses to reject the treating physician's evaluation, he "may not make 'speculative inferences from medical reports' and

---

31.    The evidence in the record documenting treatment by Dr. Trachtman from March 2001 to March 2003 is only irrelevant to establishing her history of treatment for fibromyalgia and related symptoms.

may reject 'a treating physician's opinion outright only on the basis of contradictory medical evidence' and not due to his or her own credibility judgments, speculation or lay opinion." *Id.* at 317-18 (quoting *Plummer,* 186 F.3d at 429) (other citations omitted).

When a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ is required to give that opinion controlling weight. *Fargnoli v. Massanari,* 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(d)(2)). Where, as here, the ALJ failed to give Dr. D'Auria's opinion controlling weight, the ALJ is required to explain the weight assigned to his opinion, giving due consideration to the nature, extent and length of the treatment relationship; frequency of examination; the supportability of the opinion by medical signs and laboratory findings; the consistency of the opinion with the record as a whole; and whether Dr. D'Auria is a specialist in the area upon which he is offering an opinion. 20 C.F.R. § 404.1527(d)(2)(i) and (ii), (d)(3) - (6).

The ALJ appears to have rejected Dr. D'Auria's opinion dated February 7, 2005, in its entirety, regarding the nature and severity of Plaintiff's medical impairments, on the basis that it is not well supported by the underlying medical records. (R. 19.) After reviewing the entire record, the Court finds the ALJ's rejection of Dr. D'Auria's entire opinion is not supported by substantial evidence. The underlying medical records do support the ALJ's finding that the clinical and/or diagnostic tests revealed no reoccurrence of Lyme disease since Plaintiff's AOD, no significant COPD, and no peptic ulcer disease.[32] In addition, Dr. D'Auria's conclusion that Plaintiff's chronic

---

[32] The medical records do show, however, that on October 30, 2003, Dr. Vallabh diagnosed acid peptic disease. (R. 294.)

depression and anxiety meet Listing 12.04 is not supported by the underlying medical evidence, nor

does he attempt to correlate any of Plaintiff's symptoms with those described in Listing 12.04. <u>See</u>

20 C.F.R. Pt. 404, Subpt. P, App. 1.  Rather, the treatment records of Plaintiff's physicians reflect

that she was treated for anxiety and depression with medication, and other than the referral to a

chronic pain clinic around 1987, she has not been referred to for testing or treatment, or sought

treatment from, a mental health professional.  Therefore, the ALJ properly rejected Dr. D'Auria's

opinion that her mental impairments meet Listing 12.04.

On the other hand, the underlying medical records do not support the ALJ's rejection of Dr.

D'Auria's opinion as to the nature and severity of Plaintiff's other impairments, <u>i.e.</u>, migraine

headaches,[33] fibromyalgia and related symptoms (pain, fatigue, anxiety, depression, chronic

headaches), cervical spinal stenosis, celiac sprue, gastroparesis, asthma, and tachycardia.  Contrary

to the ALJ's finding, these impairments and symptoms are well documented by the medical records

and  no contradictory medical evidence exists as to Dr. D'Auria's evaluation of these impairments.[34]

Under these circumstances, the ALJ was required to give Dr. D'Auria's opinion controlling weight.

<u>Fargnoli</u>, 247 F.2d at 43.

---

33.  The record shows a history of complaints of migraine headaches and treatment for same.  In
addition, migraine headaches are a recognized symptom/sign of fibromyalgia.

34.  The only possible contradictory medical evidence, <u>i.e.</u>, the RFC assessment provided by the
DDS physician, Dr. Kar, was rejected by the ALJ.  Because Dr. Kar did not treat or examine
Plaintiff, the ALJ was required to give his assessment less weight than that of Plaintiff's treating
physician, Dr. D'Auria.  <u>See</u> 20 C.F.R. § 404.1527(d)(2).  Indeed, the ALJ gave greater weight to
the functional limitations described in Dr. D'Auria's opinion as opposed to those described by
Dr. Kar. (R. 19.)

Since remand is necessary on the issue of Plaintiff's credibility, on remand the ALJ should also reevaluate the weight given to Dr. D'Auria's opinion as to the nature and severity of the impairments which are supported by the record, including fibromyalgia and its related symptoms, as explained above.[35]

### 3.   The ALJ's Reliance on the Vocational Expert's Testimony in Response to the Hypothetical Question May Not Have Included All of Plaintiff's Limitations

Next, Plaintiff argues that the ALJ erred in relying upon the VE's testimony in response to a hypothetical question that did not include all of Plaintiff's functional limitations. (Pl.'s Br. at 21 – 24.) Specifically, Plaintiff complains that the ALJ's hypothetical did not include:

> Plaintiff's limitations in sitting, standing, walking, lifting, and doing fine and manipulative work, ... her need to use a nebulizer four times a day, her diarrhea and vomiting, her inability to concentrate, the side effects she suffers from her medication, including tiredness, dizziness and nausea, her frequent need to lie down, her inability to maintain regular work attendance (R. 89), her inability to deal with work stressors and maintain concentration, ... ability to function independently, ability to remember and carry-out job instructions, ... and her limited ability to behave in an emotional stable manner and demonstrate reliability. (R. 457 - 59.)

(Pl.'s Br. at 22.)  Accordingly, Plaintiff contends that the hypothetical question is not supported by substantial evidence.

In order for the Court to find that a hypothetical question was based on substantial evidence, the "hypothetical question must reflect all of a claimant's impairments *that are supported by the*

---

[35]  Conspicuous by its absence is any discussion by the ALJ of the severity of Plaintiff's limitations caused by her fibromyalgia, or Dr. D'Auria's February 6, 2005 assessment of Plaintiff's mental/emotional capabilities in light of her impairments.  In the Court's view, this evidence will greatly impact the ALJ's determination of whether Plaintiff is disabled under the Act.

record." *Chrupcala v. Heckler,* 829 F.2d 1269, 1276 (3d Cir. 1987) (citing *Podedworny v. Harris,*

745 F.2d 210 (3d Cir. 1984); *Wallace v. Sec'y,* 722 F.2d 1150 (3d Cir. 1983)) (emphasis added).

In determining whether an impairment is supported by the record, the Court is guided by 42 U.S.C.

§ 423(d)(5)(A) (2003) which provides in relevant part:

> An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability . . . there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability.  Objective medical evidence of pain or other symptoms established by medically acceptable clinical or laboratory techniques … must be considered in reaching a conclusion as to whether the individual is under a disability.

42 U.S.C. § 423(d)(5)(A) (2003). See also, 20 C.F.R. § 404.1529(b).

Because the Court has determined that this case must be remanded to the ALJ for consideration of Plaintiff's subjective complaints and their effect on her RFC, the Court does not reach the question of whether the ALJ's determination at Step 5 was supported by substantial evidence.  Nonetheless, the Court instructs that if the ALJ reaches Step 5 again on remand, that any hypothetical posed to the VE must include all limitations caused by Plaintiff's fibromyalgia, cervical spinal stenosis, asthma, celiac sprue, gastroparesis, and/or tachycardia that are supported by the record.

III. <u>CONCLUSION</u>

For the reasons set forth above, it is respectfully recommended that Plaintiff's Motion for Summary Judgment (Doc. No. 7) be granted, and Defendant's Motion for Summary Judgment (Doc. No. 9) be denied, and that the decision of the Commissioner of Social Security denying an award of disability insurance benefits be vacated and remanded for further proceedings consistent with this report and recommendation.

In accordance with the Magistrates Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrate Judges, within ten (10) days after being served with a copy, any party may serve and file written objections to this Report and Recommendation.  Any party opposing the objections shall have ten (10) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,

Dated: August 17, 2007                               <u>   s/Lisa Pupo Lenihan   </u>
                                                     LISA PUPO LENIHAN
                                                     United States Magistrate Judge

cc:     Honorable David Stewart Cercone
        United States District Judge

        All Counsel of Record
        *Via Electronic Mail*

41